UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael R. MOORE, Larry P. Moore and Beverly K. Moore,
Defendants-Appellants.

No. 85–1483.

United States Court of Appeals,
Fifth Circuit.

April 16, 1986.

---

Arch C. McColl, David W. Coody, Dallas, Tex., for defendants-appellants.

Marvin Collins, U.S. Atty., Fort Worth, Tex., Harry Koch, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This is an appeal from convictions for extortion and conspiracy to commit extortion. Appellants are Michael Ray Moore, his brother Larry Paul Moore, and Michael's wife Beverly Kindel Moore. All three appellants were convicted of conspiracy to commit extortion, in violation of 18 U.S.C. § 371. Michael and Larry Moore were convicted of the substantive offense of extortion in violation of 18 U.S.C. § 1951, and Beverly Moore was convicted of aiding and abetting this offense. Michael and Larry were given concurrent sentences of twenty years imprisonment for extortion and five years for conspiracy. Beverly was given concurrent sentences of

four years imprisonment for conspiracy and three years for aiding and abetting extortion. We affirm.

### Facts

The background facts to this case read like a movie script.[1] On January 20, 1984, at approximately 7:15 a.m., three armed men wearing masks entered the home of Robert James Bigham, the president of Promenade National Bank of Richardson, Texas. The men attached bogus bomb devices to Bigham and his wife and daughter. Bigham was told to follow instructions and fill two satchels with money from his bank or the bomb devices would be detonated by remote control. Bigham left his home alone, and went to his bank where he obtained $48,000. Following written instructions, Bigham dropped the money into a City of Dallas trash can, and returned home at approximately 9:00 a.m. The men had gone, and Bigham's family was physically unharmed.

According to trial testimony of a coconspirator, Steven Nail, the three masked assailants were appellants Michael Moore and Larry Moore, and Nail. At approximately 8:15 a.m. on January 20, the three masked assailants left the Bigham residence and went to the drop site. The trash can at the drop site had a fake bottom and was placed over a manhole leading into a sewer line. Nail and Larry Moore went into the sewer line underneath the fake-bottomed trash can. Nail and Larry Moore took the money from the can and then crawled through an underground tunnel system to a grate. Nail's Corvette was parked over the grate. Nail and Larry Moore got into the car through a hole they had earlier cut in the bottom of the Corvette, and all three of the extortionists traveled to the Moores' place of business, Custom Electric Shop. At Custom Electric, the men were met by Beverly Moore, and they counted and split up the money.

The F.B.I. arrested Nail. Nail confessed, and his confession implicated the Moores. At the trial Nail testified and told how he

---

**1.** In fact, they were a movie script. The movie *Loophole* was the inspiration for this crime.

and the Moores had come up with the plot after watching the movie *Loophole* at the Moore's home.[2] Nail described how the extortionists selected the victim, and had made the preparations for the extortion.[3] Two additional eyewitnesses, Nina Lamberth and Jack Holder, testified for the United States. Holder testified that he had seen Larry Moore and two other men casing the Bigham residence several mornings before the extortion. Lamberth identified Michael Moore as the driver of a pick-up truck leaving the Bigham residence immediately after the extortion.

The Moores advanced two defenses at trial: (1) Nail is crazy; and (2) alibi. For the alibi defense appellants were counting on Judy Jones, who had given a sworn statement that Michael and Larry Moore did electrical work at her house between 8:30 a.m. and 9:00 a.m. the morning of the crime. At trial, however, Judy Jones testified that she was mistaken about the time, and that the Moores were not at her home until that afternoon. The jury found the Moores guilty.[4] They now complain that several errors were committed during the trial.

### I. Expert Testimony on Eyewitness Identification

Appellants sought to counteract the eyewitness identifications of Lamberth and Holder by presenting the expert testimony of Dr. Elizabeth Loftus. Dr. Loftus would have testified about such things as the "forgetting curve," which shows that memory decreases at a geometric rather than an arithmetic rate; the "assimilation factor," which indicates that witnesses sometimes incorporate inaccurate post-event information into their identifications; the "feedback factor," which demonstrates that witnesses who discuss the case with each other unconsciously may reinforce mistaken identifications; and several other psychological theories relating to eyewitness identification. The district judge excluded this testimony, stating that he felt the probativeness of eyewitness testimony was not a matter which needed evaluation by experts. The judge went on to say that in any event the admissibility of such testimony was within his discretion. Appellants urge that this testimony was relevant and erroneously excluded because it was vital in the present case. They assert that the casual eyewitness identifications were questionable under the particular physical circumstances. For example, Lamberth based her identification on having seen Moore for only a five to six second interval seventeen months before the trial.

Until recently, courts were uniformly skeptical about admitting expert testimony concerning the reliability of eyewitness identifications. One of the first cases to address this issue was *United States v. Amaral*, 488 F.2d 1148 (9th Cir.1973). *Amaral* held that the district court did not err in excluding expert eyewitness testimony because cross-examination was adequate to reveal any faults in the identifications. Court have subsequently upheld exclusion of such testimony under a variety of rationales. For example, courts have

2. *Loophole* takes place in London. The two main characters are Martin Sheen, who is an architect, and Albert Finney, who is a career criminal. The movie begins with Martin Sheen losing his job, and vainly searching for a new job. He is offered a job by Finney. Finney, posing as a man desiring to add three floors to a building, is actually casing the bank across the street for a robbery. Sheen after a first refusal agrees to participate in the robbery.

    Sheen, Finney, and four others drive a van over an open manhole cover. The bottom of the van is cut out. The men then drop from the inside of the van into the sewer system. The men then walk through the tunnel system until they are under the safe in the bank. The men use jack hammers to go through part of the tunnel and come up inside the vault. They successfully remove the loot. The film presents a "happy" ending for the burglars. At the end Sheen is in charge of his own architectural agency and Finney is also looking very well.

3. The preparations included cutting the grate, manufacturing the trash can, and cutting out the bottom of a trailer (the trailer was not used) and the Corvette. After the extortion, Nail's Corvette was repainted in the Custom Electric Shop to disguise it.

4. In addition to their prison sentences, the Moores were ordered to pay $48,700.00 in restitution.

found that this type of scientific evidence has not obtained a suitable level of general acceptance in the legal and scientific communities, *United States v. Sims*, 617 F.2d 1371, 1375 (9th Cir.1980), that the evidence is prejudicial, *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir.1979), or that the evidence is within the expertise of the juror. *United States v. Purham*, 725 F.2d 450, 454 (8th Cir.1984). We have held that any problems with perception and memory are easily understood by jurors and can be adequately addressed through cross-examination. *United States v. Thevis*, 665 F.2d 616, 641 (5th Cir.1982). *See also United States v. Brown*, 540 F.2d 1048, 1054 (10th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1976).

We have found no federal cases which hold that a trial court abused its discretion by excluding expert eyewitness identification testimony. Recent decisions, however, do indicate a new willingness to uphold a trial judge's admission of such testimony and a willingness to evaluate the adequacy of reasons for justifying exclusion of such testimony in particular cases. In *United States v. Smith*, 736 F.2d 1103, 1105 (6th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984), the court held that although expert eyewitness testimony was a "proper subject," had general scientific acceptance, and "provided probative value," exclusion was not harmful on the facts of that case because there was evidence indicating guilt apart from the eyewitness identification. *Id.* at 1108. Similarly, in *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985), the court reversed a trial court holding that such testimony is never admissible in federal court, and held that the trial court should exercise its discretion in deciding whether or not to admit it and should balance the reliability of the testimony against the likelihood that the testimony would overwhelm or mislead the jury. Two state court decisions have recently held that it was error not to admit this type of expert testimony. *People v. McDonald*, 37 Cal.3d 351, 690 P.2d 709, 208 Cal.Rptr. 236 (Cal.1984); *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (Ariz.1983).

This Court accepts the modern conclusion that the admission of expert testimony regarding eyewitness identifications is proper, and we have no prior contrary authority which binds us. We cannot say such scientific data is inadequate or contradictory. "The scientific validity of the studies confirming the many weaknesses of eyewitness identification cannot be seriously questioned at this point." Abney, *Expert Testimony and Eyewitness Identification*, 91 Case & Comment 26, 29 (March/Apr. 1986); *see also Smith*, 736 F.2d at 1107 (this testimony now conforms to "generally accepted ... theory").

Expert testimony on eyewitness reliability is not simply a recitation of facts available through common knowledge. Indeed, the conclusions of the psychological studies are largely *counter-intuitive*, and serve to "explode common myths about an individual's capacity for perception ..." *Smith*, 736 F.2d at 1105. For example, it is commonly believed that the accuracy of a witness' recollection increases with the certainty of the witness. In fact, the data reveal no correlation between witness certainty and accuracy. Similarly, it is commonly believed that witnesses remember better when they are under stress. The data indicate that the opposite is true. The studies also show that a group consensus among witnesses as to an alleged criminal's identity is far more likely to be inaccurate than is an individual identification. This is because of the effect of the "feedback factor," which serves to reinforce mistaken identifications. We therefore recognize that the admission of this type of testimony is proper, at least in some cases.

■■■ Nevertheless, in the present case we do not find that the district court abused its discretion in refusing to admit this evidence. We have earlier held and we now affirm that the decision whether to admit this testimony is squarely within the discretion of the trial judge and properly so. *Thevis*, 665 F.2d at 614; *Downing*, 753 F.2d at 1226. Although admission of expert eyewitness testimony is proper, there

is no federal authority for the proposition that such testimony *must* be admitted. The district judge has wide discretion in determining the admissibility of this evidence, and we hold that the district judge did not abuse his discretion in this case.

In some cases casual eyewitness testimony may make the entire difference between a finding of guilt or innocence. In such a case expert eyewitness identification testimony may be critical. But this is not at all the situation in the case before us. Even if the eyewitness identifications of Lamberth and Holder are completely disregarded, the other evidence of guilt is overwhelming. The jury had the right to believe Nail's testimony in full, and it established complete guilt. In addition, however, radios and guns identified as those used in the extortion were found in the Moores' possession. The tools used in preparation for the extortion were found in the Custom Electric Shop, as were the materials used to repaint Nail's Corvette. A trailer with the bottom cut out was found at the Custom Electric Shop. The Moores admitted watching the movie *Loophole* shortly before the date of the extortion. All of the physical evidence strongly corroborates Nail's testimony which described in detail the extortion and the participation of the Moores. *See Smith,* 736 F.2d at 1107 (any error in exclusion of expert eyewitness testimony harmless because defendant's palmprint found at the scene of the crime).

█ We emphasize that in a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged. In the present case, we find no abuse of discretion in not admitting such evidence. This was not a case where cas-

ual eyewitness identifications were at all critical.

## II. *Witness Abandonment of Alibi Testimony*

█ Judy Jones stated under oath prior to trial that appellants were doing work at her house in the morning hours at the same time that this extortion was being carried out. At trial, she testified that she was mistaken about the time. After discussing the circumstances with her houseguest, she had come to the conclusion that appellants had actually been at her house that afternoon. The prosecution presented testimony from Jones' houseguest which confirmed Jones' trial testimony. Appellants contend that the reason that Jones changed her story was because: (1) Jones and Nail had some kind of relationship which made Jones want to change her story; and/or (2) the F.B.I. put pressure on Jones and Jones' husband to get Jones to change her story. Appellants wanted to introduce evidence on these theories at trial, but the district court excluded the evidence.[5]

A trial court has "broad discretion in determining how and why bias may be proved and what collateral evidence is material to that purpose." *United States v. Landes,* 704 F.2d 152, 153 (5th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 176, 78 L.Ed.2d 158 (1983). We find that the district court did not abuse its discretion in refusing to admit this testimony. The proffered evidence regarding Jones' relationship with Nail was weak. Defense counsel wanted to introduce evidence that Nail was once heard saying, "Yes, Judy Jones and I go way back," that Judy Jones once talked with Nail on the telephone for

---

5. The reason given by the district court for excluding this evidence was that it was an attempt to impeach with a specific instance of conduct on a collateral matter by extrinsic evidence, and thus was inadmissible under F.R.E. 608(b). This was not a proper ground of exclusion. Rule 608(b) provides that "specific instances of the conduct of a witness, *for the purpose of attacking or supporting his credibility,* ... may not be proved by extrinsic evidence."

The evidence in the present case was not offered to attack Jones' *credibility,* but rather was offered to explain the reason for the discrepancy between Jones' two stories. "Bias, as opposed to general veracity, is not a collateral issue." *United States v. Fusco,* 748 F.2d 996, 998 (5th Cir.1984). Thus, "evidence of past behavior that proves or disproves bias is ... admissible notwithstanding Rule 608(b)." *Id.; see also United States v. Hodnett,* 537 F.2d 828 (5th Cir.1976).

thirty minutes, and that they once embraced. This testimony even if true had so little probative value in relation to Judy Jones' testimony at trial that we do not find any abuse of discretion by the district court in excluding it. *See Carter v. Massey-Ferguson, Inc.,* 716 F.2d 344, 348 (5th Cir.1983) (no abuse of discretion in excluding evidence with low probative value).

As for the F.B.I. bias evidence, defense counsel wanted to introduce testimony that F.B.I. agents talked to Jones' husband before they talked to her, and that it was embarrassing to Jones' husband for Jones to assist Mike and Larry Moore. This evidence also had so little probative value that we do not find any abuse of discretion in refusing to admit it. In any event, defense counsel was allowed on redirect to question Jones about the F.B.I. contacts with her husband. The court held that the "door was opened" to this testimony by the government on cross-examination. The record indicates that Jones was fully questioned about any F.B.I. involvement, so there was certainly no error.

### III. *Sufficiency of the Evidence: Beverly Moore*

■ Beverly Moore contends that there is a lack of evidence to prove that she knew of, intended to join, and participated in the conspiracy or that she aided and abetted the extortion scheme. We "review the evidence and the inferences which may be drawn therefrom in the light most favorable to the government." *United States v. Grubbs,* 776 F.2d 1281, 1289 (5th Cir.1985). We must judge the evidence as sufficient to support a conviction if "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Stephens,* 779 F.2d 232, 235 (5th Cir.1985) (quoting *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd* 462 U.S. 356, 103 S.Ct. 2398, 77 L.Ed.2d 638 (1983)).

Nail testified that Beverly was aware of the conspiracy and that she help set up the plans for the extortion. There was testimony that she went to Houston with her husband to buy shopping bags and sample cases for use in the extortion. There was also testimony that Beverly counted the money with the other extortionists at the Custom Electric Shop the morning of the crime. We find that the record supports the verdict of the jury that Beverly Moore was a part of the conspiracy and aided and abetted in the extortion.

### IV. *Psychiatric Condition of Steven Nail*

Appellants contend that the district court erred by not allowing them to introduce certain evidence relating to the mental instability of Steven Nail. Although appellants were allowed to introduce extensive evidence regarding his psychiatric condition, they contend that they should have been allowed to introduce even more. Specifically, appellants claim that the district court erred in: (1) excluding medical records prepared by Veterans Administration and Army doctors; (2) excluding evidence of a camping trip in which Nail participated; and (3) failing to give an instruction to the jury that Nail's psychiatric problems should affect the jury's evaluation of his testimony.

We first note that the jury was presented with a complete picture of Nail's mental state notwithstanding the exclusion of the above proffered evidence. There was extensive testimony admitted regarding Steven Nail's bizarre personality. Nail testified that he had "post-traumatic stress disorder" in which he often "continually [was] thinking that [he was] in Vietnam ..." Nail described an incident in 1983 where he put a .45 caliber pistol in his mouth and tried to kill himself, but could not because he could not remove the safety. Nail related that he liked to dress in combat fatigues and patrol the Trinity river bottom in south Dallas County playing war games. Nail admitted that there were long periods of time when he was living with his mother that he stayed in his room night after night always wearing army fatigues. When defense counsel asked, "And during that time is it accurate that you dressed in fatigues and you hid in the trees and brush and

killed crows?," Nail replied, "That is correct. Not in the trees but in the brush."

A statement that Nail made to a doctor was read to the jury. In it Nail said, "There are times that I just want to blow away someone with what is available or put my hands around someone's throat and snap it off." The evidence also showed that Nail received payments upon his Army discharge from the government for a 30 percent disability connected with post-traumatic stress disorder, that Nail may have been discharged from the Army because of psychiatric problems, and that Nail underwent psychiatric and psychological testing by several doctors prior to his sentencing for his role in the Bigham extortion.

In addition, the defense presented the testimony of Dr. Clay Griffith, a psychiatrist, who testified that Nail has a incurable anti-social personality disorder, and that Nail is a "moral imbecile," and a "psychopath." Dr. Griffith testified in great detail about his observations of Nail, and concluded that if there were a scale of one to ten of anti-social personality disorders, with ten being the highest, Nail would be about an eight. In closing arguments before the jury, the government admitted that Nail was mentally disturbed. The prosecutor stated:

> I am not going to defend Nail to you. He is a robber. He is anti-social. Whether he is a killer in civilian life or whatever other thing he might be, I don't know, but he is certainly a very unpalatable sort of person.

With such a detailed description of Nail's psychiatric condition before the jury, we do not find any reversible error in the judge's refusal to admit more evidence regarding his instability.

■ In any event, appellants' complaints are without merit even if the other evidence of Nail's psychiatric problems is disregarded. Appellants sought to introduce medical records consisting of opinions and conclusions of doctors without making those doctors available for cross-examination. That evidence was inadmissible. *United States v. Partin,* 493 F.2d 750, 762 (5th Cir.1974), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

■ The excluded camping trip evidence consisted of testimony from Steve Kinkle. Appellants wished to show that Nail, while on a social camping outing, shot out the back of a boat, acted in a very "reclusive" manner, and made odd comments about his ability to kill all of the other campers. This evidence was offered to impeach the mental capacity of Nail, and was admissible. *Greene v. Wainwright,* 634 F.2d 272 (5th Cir.1981); *United States v. Lindstrom,* 698 F.2d 1154 (11th Cir.1983); J. Weinstein, *Weinstein's Evidence* § 607[4] (1981). The record indicates, however, that the defense was allowed to present the evidence of the camping trip. The defense introduced a letter from Michael Moore which characterized the camping trip and described Nail's behavior on the camping trip. The record indicates that the evidence which appellants claim was excluded was actually admitted later in the trial in the form of Michael Moore's letter.

■ Finally, appellants wanted the judge to instruct the jury that Nail has psychiatric illnesses, so the jury should be cautious in evaluating his testimony.[6] The judge instructed the jury that it was their responsibility to evaluate the credibility of the witnesses and to determine how much weight to accord their testimony. We find that the jury was properly instructed in the present case. In evaluating a jury charge, we must view the instructions as a whole. *Robert v. Conti Carriers & Terminals, Inc.,* 692 F.2d 22, 24 (5th Cir.1982). No particular form of words is essential if the instruction as a whole conveys a correct statement of the applicable law and is not

---

6. The proffered instruction was:

You have heard evidence regarding the psychiatric illnesses of the Government's witness, Steven Scott Nail. While this evidence does not render him incompetent to testify, you should exercise caution in receiving his testimony and weigh it with great care, because many types of emotional or mental defects may materially affect the accuracy of testimony.

misleading to the jury. *Wright v. Wagner,* 641 F.2d 239, 242 (5th Cir.1981). We find no error in the exclusion of evidence regarding Steven Nail's psychiatric condition or in refusing to give a specific jury instruction on Nail's mental problems.

### V. *Pistols in the Pickups*

■ The F.B.I. seized pistols from both Larry Moore's and Michael Moore's trucks. These pistols were seized as the agents served them with grand jury subpoenas arising from disclosures made to them by Nail. The agents did not have warrants, but had information that both Larry and Michael were armed. When stopped, both Larry and Michael indicated that they were not armed. However, handguns were found in plain view. The handguns were seized, and were later presented in evidence against the Moores as the guns used in the robbery. It appears that at the time of the seizures there was no probable cause to believe that the handguns were the ones used in the extortion. Appellants asserted that these seizures of the handguns violated their Fourth Amendment rights. The district court denied their motion to suppress.

*Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), authorizes law enforcement agents to conduct a protective search of the passenger compartment of an automobile "limited to those areas in which a weapon may be placed or hidden, if the [agent] possesses a reasonable belief ... that the suspect is dangerous and the suspect may gain immediate control of the weapons." *Id.* at 1049. 103 S.Ct. at 3480, 77 L.Ed.2d at 1220 (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Appellants concede that the initial seizure was proper under *Long.* They contend however that the continued retention of the handguns, in the absence of probable cause to believe they were connected with the robbery, constituted an illegal warrantless search. Appellants rely upon *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), for this proposition.

In the present case, we hold that the continued retention of the handguns did not violate appellants' Fourth Amendment rights. Appellants concede that the initial seizure was proper under *Long. Long* is merely a variant of a *Terry* protective weapon search. In *Terry,* the Supreme Court specifically held that "any weapons seized may properly be introduced in evidence against the person from whom they were taken." 392 U.S. at 31, 88 S.Ct. at 1885, 20 L.Ed.2d at 911–13. *Terry* therefore compels the conclusion that the continued retention of the handguns for use as evidence at trial was permissible.

*United States v. Place,* the case appellants rely upon, does not control. In *Place,* the Supreme Court held that detention of luggage in a traveler's immediate possession for longer than ninety minutes was too long for a *Terry* justified detention, and it invalidated the seizure. The luggage in *Place* is obviously different in kind from deadly weapons. The Supreme Court invalidated the seizure of the luggage in *Place* because detention of luggage in a traveler's immediate possession effectively is the same thing as detention of the person. 462 U.S. at 708–09, 103 S.Ct. at 2645, 77 L.Ed.2d at 121–22. The reason is because the traveler "is subjected to the possible disruption of his travel plans in order to remain with his luggage or arrange for its return." *Id.* On the other hand, seizure of a handgun, as occurred in *Terry,* does not effectively detain the person. Further, it is cause in itself for detention until possible justification for possession of the weapon is explored. The weapons seized can therefore be used as evidence at trial. *Terry,* 392 U.S. at 31, 88 St.Ct. at 1885, 20 L.Ed.2d at 911–13. Accordingly, we find no error in the district court's denial of the motion to suppress.

### Conclusion

We find all of the contentions of appellants to be without merit, and we affirm their convictions.

AFFIRMED.