United States Court of Appeals
Fifth Circuit

**F I L E D**

September 28, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

No. 05-30317

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**ALFRED McGINNIS,**

**Defendant-Appellant.**

**Appeal from the United States District Court**
**for the Eastern District of Louisiana**
**(2:04-CR-196)**

Before DAVIS, BARKSDALE, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

Alfred McGinnis was convicted of: armed bank robbery, in violation of 18 U.S.C. § 2113(a) & (d); and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1). He challenges the exclusion of expert-witness testimony on the subject of witness-identification errors. **AFFIRMED**.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

At approximately 3:30 p.m. on 15 June 2004, a black male of medium height and stocky build robbed a bank in New Orleans, Louisiana.  The robber wore a hat, sunglasses, and painter-style jeans with white stitching; carried a dark-colored duffel bag and gun; pointed the gun at two bank tellers while ordering the duffel bag to be filled with money; and began to count down from ten.  The tellers complied, and the robber escaped on foot with $9748 in the duffel bag.

On 19 June, four days after the robbery, a headshot photo of the robber, taken from a surveillance camera inside the bank, was published in New Orleans' newspaper, **The Times-Picayune**, requesting readers to identify the robber.  Nine individuals made telephone calls based on the photograph.  Two callers identified McGinnis; seven others identified seven other persons.  The two callers who identified McGinnis were his co-workers at the Veterans Administration Medical Center.  FBI Agents then interviewed three other co-workers, who also identified McGinnis as the robber in the photograph; a few of these witnesses said the robber looked like McGinnis because of the distinctive way he tilted or positioned his head.  One of the witnesses, McGinnis' supervisor, stated McGinnis had left work one month before the robbery and had not returned.

Relying on these recognition witnesses, the FBI executed arrest and search warrants for McGinnis and his home.  In McGinnis'

bedroom closet, FBI Agents found painter-style jeans and a duffel bag similar to that used in the robbery. Following his arrest, McGinnis called his wife from jail, and she told him "eight dollars" were missing, in the context of a conversation where McGinnis and his wife lamented they could no longer afford a $399 swimming pool.

McGinnis intended to call Dr. Robert Shomer, a psychologist, as an expert witness at trial. The Government moved *in limine*, however, to exclude his testimony. McGinnis responded that Dr. Shomer would address psychological problems resulting from witness identifications. In addition, in an earlier letter to the court, responding to the Government's motion, McGinnis' counsel stated his intent to rely on Dr. Shomer's expertise relating to: "factors that may impact a witness's ability to process, store and recall information from a stressful event"; and "problems relating to misidentification by eyewitnesses or other witnesses who have relied on photographs to identify alleged perpetrators". The district court decided to rule on the Government's motion *after* it presented its case-in-chief at trial.

At the conclusion of the Government's case, Dr. Shomer was questioned outside the jury's presence regarding his potential testimony. Based on this examination, the district court excluded that testimony, stating "the jury can fully appreciate a misidentification, if, in fact, one occurred".

On 3 November 2004, the jury found McGinnis guilty. Subsequently, he was sentenced, *inter alia*, to 60 months imprisonment for armed bank robbery and 84 months for brandishing a firearm during a crime of violence, to be served consecutively.

## II.

McGinnis raises two issues on appeal. Primarily, he challenges the exclusion of his expert's testimony. Concomitantly, he presents a constitutional challenge concerning the resulting harm to his defense. The exclusion of expert-witness testimony is reviewed for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *United States v. Dixon*, 413 F.3d 520, 523 (5th Cir. 2005).

## A.

The admissibility of expert testimony is governed by the Federal Rules of Evidence, which instruct:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Under this rule, and pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "expert testimony is admissible ... only if it is both relevant and

4

reliable". *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244-45 (5th Cir. 2002). "In *Daubert*, the Supreme Court stated that Rule 702 requires that expert testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue'." *Id.* at 245 (quoting *Daubert*, 509 U.S. at 591). Thus, under Rule 702, even a qualified expert need not be permitted to testify if, in the district court's broad discretion, the testimony would *not assist* the jury. *Dixon*, 413 F.3d at 524. An example is if the testimony would provide information that is a matter of common knowledge. *United States v. Harris*, 995 F.2d 532, 534 (4th Cir. 1993).

Regarding experts called to provide psychological theories, "any problems with perception and memory are easily understood by jurors and can be adequately addressed through cross-examination". *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986). Our court has also acknowledged that the results of "psychological studies are largely *counter-intuitive*, and serve to explode common myths about an individual's capacity for perception". *Id.* (emphasis in original; internal quotation marks omitted).

In *Moore*, this court examined, and affirmed the exclusion of, expert testimony regarding eyewitness identification; the expert was to testify regarding psychological theories of eyewitness identification, including the "forgetting curve", the "assimilation factor", and the "feedback factor". *Id.* at 1311. Despite the counter-intuitive nature of some psychological theories and an

5

acceptance of expert testimony addressing the reliability of eyewitness identifications, the expert's exclusion was affirmed. *Id.* at 1312-13. Although "expert eyewitness identification testimony may be critical" when eyewitness testimony "make[s] the entire difference between a finding of guilt or innocence", it obviously becomes considerably less critical when physical evidence of guilt substantiates such testimony. *Id.* at 1313; *see* *id.* ("We emphasize that in a case in which the sole testimony is casual eyewitness identification, expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged.").

In contrast to *Moore*, where "overwhelming" evidence existed of the defendants' guilt, the exclusion of expert testimony was reversed in *United States v. Alexander*, 816 F.2d 164 (5th Cir. 1987), *cert. denied*, 493 U.S. 1069 (1990). Following a robbery at a savings and loan institution (bank), copies of robbery photographs shown to its employees were displayed throughout New Orleans' central business district. *Id.* at 166. An undisclosed individual stated that the robber in the photograph distributed after the robbery looked like Alexander. A copy of Alexander's driver's license photograph was placed beside six other individuals' photographs, from which three bank employees, who had seen the robbery videotape and verified the man on the surveillance

6

tape was the robber, independently selected Alexander. *Id.* at 166. No physical evidence linked Alexander to the robbery. *Id*.

At trial, as before, Alexander claimed mistaken identity. The three bank employees testified, as did several recognition witnesses; four such Government witnesses were acquaintances who said the robber in the photograph looked like Alexander, contradicting the five defense witnesses who testified that the robber in the photograph did *not* look like him. *Id*. The district court excluded testimony of Alexander's two experts: an orthodontist, who specialized in celphalometry (scientific measurement of head dimensions) and was to aid jurors in their visual comparison of the robber's and Alexander's heads; and a former FBI Agent, who was to make photographic comparisons and address the distortion in pictures taken by bank surveillance cameras. *Id.* at 167.

In holding the district court had abused its discretion in excluding the evidence and committed reversible error, our court relied on "the specific nature of the proffered testimony ... , together with the *complete lack* of any evidence other than the eyewitness identification". *Id*. (emphasis added). The court distinguished these experts, who would testify to "the precise issue before the jury", from the one in **Moore**, who "would have testified only about general problems with perception and memory". *Id.* at 169.

7

It goes without saying that cross-examination serves a critical function, enabling jurors to appreciate discrepancies in testimony. *E.g., **Harris***, 995 F.2d at 536. Along this line, "the problems of perception and memory can be adequately addressed in cross-examination and ... the jury can adequately weigh these problems through common-sense evaluation". ***United States v. Smith***, 122 F.3d 1355, 1357 (11th Cir.) (internal citation omitted), *cert. denied*, 522 U.S. 1021 (1997).

In determining whether an expert witness' exclusion was an abuse of discretion (typically in the context of offering testimony regarding *eyewitnesses*), other circuits appear to examine both whether other evidence beyond the lay-witness testimony ties the defendant to the crime, and whether defense counsel was given an opportunity to thoroughly cross-examine those witnesses. *See* ***United States v. Langan***, 263 F.3d 613, 624 (6th Cir. 2001) (noting the value of both "careful cross-examination" and the "substantial amount of other evidence"); ***United States v. Carter***, 410 F.3d 942, 950 (7th Cir. 2005) (providing three factors that justify the district court's exercise of its discretion to exclude witness identification testimony: (1) cross-examination of lay witnesses; (2) "significant additional evidence" beyond eyewitness identification; and (3) cautionary instructions from the district court regarding risks of eyewitness identification); ***United States v. Villiard***, 186 F.3d 893, 895 (8th Cir. 1999) (explaining "we are

8

especially hesitant to find an abuse of discretion [in excluding expert testimony about eyewitness identification] unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony" (alteration in original; internal quotation marks omitted)); and *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1125 (10th Cir. 2006) (noting "skillful cross-examination provides an equally, if not more, effective tool for testing the reliability of an eyewitness").

As discussed, after the Government's case-in-chief, and upon hearing Dr. Shomer's proposed testimony outside the presence of the jury, the district court ruled on the motion to exclude that testimony. In excluding it, the district court relied on Rule 702's relevance requirement: an improper fit existed between Dr. Shomer's expertise and the facts of McGinnis' case, as developed at trial. The district court characterized Dr. Shomer's testimony as offering two opinions:

> First, that the newspaper photograph perhaps given its size, its smaller size, as well as the depiction of the perpetrator with portions of his face covered, would be problematic for identification by a person viewing that picture to say, one person versus another .... And the second opinion, the assumption versus perception opinion ....

Dr. Shomer then clarified that he would also testify regarding a third opinion: "how [to] assess the accuracy of eye witness ID from a standardized procedure".

9

In excluding the testimony, the court stated: "[C]learly[,] the testimony that [Dr. Shomer] is going to offer [will attempt] to somehow suggest to the jury that mistakes can be made. That is an opinion that people from every walk of life can formulate". It concluded:

> [T]he case is different than my appreciation of what it was going to be when we discussed this [pre-trial] .... I think everything that I have heard from this expert was covered by defense counsel very ably in his cross examination of those witnesses, relative to any shortcomings or inaccuracies of those identifications, any infirmities in connection with those identifications[,] and I think that he has covered that in his cross examination and I think the jury can fully appreciate a misidentification, if, in fact, one occurred. You will certainly ... be given the opportunity to argue that to the jury.

As discussed *supra*, the expert testimony of Dr. Shomer, who has been admitted to testify as an expert on numerous occasions and whose expertise in his field is not challenged, may be admitted only if it assists the jury. *See* **Pipitone**, 288 F.3d at 245. The prior exclusion of his testimony by the Ninth Circuit is highly instructive. In **United States v. Poole**, 794 F.2d 462 (9th Cir. 1986), the defendant was convicted of robbing two savings and loan institutions after eyewitnesses identified him from a photospread. The defendant sought to introduce expert testimony by Dr. Shomer to address possible defects in eyewitness identifications. The Government's motion *in limine* to exclude that testimony was granted, and the Ninth Circuit affirmed, relying on its earlier

10

holding "that 'effective cross-examination is adequate to reveal any inconsistencies or deficiencies in the eye-witness testimony'". *Id.* at 468 (quoting *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir. 1973)).

McGinnis' case falls somewhere between our court's decisions in *Moore* and *Alexander*: the other evidence of guilt is neither "overwhelming", as in *Moore*, nor non-existent, as in *Alexander*. The evidence includes the painter-style jeans with distinctive white stitching and the duffel bag found in McGinnis' bedroom closet. Evidence at trial showed that, although the painter-style jeans were likely a common variety of trousers, this pair had a well-worn crease from being folded at the bottom, as did those worn by the robber. Further, they looked the same as the robber's trousers through the bank's surveillance camera. In this regard, the lead FBI Agent investigating the case explained how he placed McGinnis' jeans on a mannequin and took it to the bank to photograph McGinnis' jeans with the same surveillance equipment.

Defense counsel elicited some doubt concerning these items seized at McGinnis' home. On direct examination, both bank tellers had been shown McGinnis' duffel bag and had stated it was the bag used in the robbery. On cross-examination, however, they were unable to remember its exact coloring, although both remembered it was dark; they also did not remember whether they had seen a medallion like the one that figured prominently on McGinnis' bag.

In addition, direct and cross-examination of lay witnesses revealed: seven individuals *in addition to McGinnis* had been identified from the photograph placed in the newspaper; and, although most of those seven individuals were later ruled out as suspects, this was not done until *after* McGinnis had been arrested. McGinnis' counsel challenged the recognition witnesses and their conclusions that the robber looked like McGinnis; he asked each of McGinnis' co-workers: whether they knew other callers had named other possible suspects based on the picture in the newspaper; and whether they were asked to select McGinnis from a set of photographs. When each witness answered the latter question in the negative, McGinnis' counsel emphasized the witnesses operated from a "sample of one". Among other things, this may have been for later use in Dr. Shomer's proposed testimony that these individuals were not asked to select McGinnis from a line-up. That these recognition witnesses, each of whom knew McGinnis, may, or may not, have benefitted from a line-up was not beyond the jury's comprehension. Nor was the jury unaware that neither the Government nor the defense asked the eyewitness bank tellers to identify McGinnis as the robber.

Further, McGinnis' counsel questioned the witnesses about their confidence level in their recognition of McGinnis. Among other things, this was for later use in Dr. Shomer's proposed testimony that witness confidence in an identification does *not*

correlate with accuracy of identification. *See **United States v. Brownlee***, 454 F.3d 131, 140-44 (3d Cir. 2006). Although this confidence-level testimony might have been made more beneficial to McGinnis through Dr. Shomer's proposed testimony, the district court did not abuse its discretion in concluding the jurors could disbelieve the Government's witnesses (and, therefore, in excluding Dr. Shomer's testimony).

The excluded expert testimony more closely aligns with the general psychological testimony excluded in ***Moore*** than the precise, tailored testimony admitted in ***Alexander***. Needless to say, we need not decide whether, had McGinnis presented an expert in celphalometry or an expert in photographic comparisons, an exclusion of that testimony would be an abuse of discretion. *See **Alexander***, 816 F.2d at 167.

Further, unlike eyewitness cases, where an expert could reasonably testify about the impact of a stressful situation and memory of an eyewitness to a crime, the recognition witnesses at issue here all testified the photographs *looked like* McGinnis, but it was repeatedly clarified that none of these witnesses were at the robbery. A jury does *not* need an expert to explain that these witnesses could not confirm McGinnis' presence at a robbery at which they were not present. *See **Dixon***, 413 F.3d at 524.

The district court's prudent approach in ruling on the motion to exclude comported with Rule 702. It delayed ruling until after

13

the Government's case-in-chief and hearing Dr. Shomer's proposed testimony outside the presence of the jury.  Only then did it conclude the testimony would *not* be helpful to it.  Based on our review of the record, this ruling did *not* constitute an abuse of discretion.

B.

Concomitantly, McGinnis maintains the exclusion of the testimony violates the Constitution.  He asserts his right to present a complete defense — under either the Due Process Clause of the Fifth Amendment or the Compulsory Process and Confrontation Clauses of the Sixth Amendment — was thwarted because he was unable to challenge a critical portion of the Government's case. (Although McGinnis did not raise this claim at trial, he did preserve it for review by raising it pre-trial in opposition to the Government's motion *in limine*.  *See* FED. R. EVID. 103(a).)

No violation of the right to present a complete defense occurs where, as here, the trial proceedings involved several witnesses for both the Government and the defense, and this particular witness was excluded because the district court concluded, after listening to the witness' proposed testimony, that it would *not* assist the jury.  *See* **United States v. Miliet**, 804 F.2d 853, 859 (5th Cir. 1986) (noting that a complete defense challenge is meritorious when two factors are present:  the excluded evidence is

14

indispensable to the theory of defense; and the district court fails to provide a rational justification for its exclusion).

### III.

For the foregoing reasons, the judgment is

*AFFIRMED.*

15