Gene BIBBINS, et al.

v.

CITY OF BATON ROUGE, et al.

Civil Action No. 04–122–JJB.

United States District Court, M.D. Louisiana.

May 11, 2007.

and a motion *in limine* to exclude Dr. Wells' testimony on eyewitness identification (doc. 161). Bibbins opposes both of these motions (doc. 166). The defendants have collectively filed a reply brief (doc. 171). Thirdly, defendant Annie Michelli filed a motion for summary judgment (doc. 116). Bibbins opposes that motion (doc. 147). Michelli has filed a reply brief (doc. 155).

Fourth, defendants Jeri Gayle, Robin Davis, Julius O'Brien, Richard Remington, and Errol Voinche have collectively filed a motion for summary judgment (doc. 119). Bibbins filed an opposition to that motion (doc. 142). The defendants collectively filed a reply brief (doc. 156). Fifth, the City has filed a motion for summary judgment (doc. 127). Bibbins opposes the motion (doc. 145). Finally, all defendants have collectively filed a motion *in limine* to admit evidence of a conviction and sentence (doc. 151), to which Bibbins has filed an opposition (doc. 165). The defendants collectively filed a reply brief (doc. 170).

Barry C. Scheck, The Innocence Project, Deborah L. Cornwall, Cochran Neufeld & Scheck, LLP, New York, NY, Connie Marie Aucoin, Law Office of R. Bruce MacMurdo, Baton Rouge, LA, Laurie A. White, Laurie A. White & Associates, New Orleans, LA, for Gene Bibbins, et al.

James L. Hilburn, Parish Attorney's Office, Leu Anne Lester Greco, Greco Law Firm, LLC, Henry D.H. Olinde, Jr., James Dejean Prescott, III, Scott Edward Mercer, Couhig Partners, LLC, Barbara Irwin Messina, Barbara Irwin Messina, LLC, Allison Ashurst Fitzgerald, Louisiana Department of Public Safety, Baton Rouge, LA, for City of Baton Rouge, et al.

## RULING AND ORDER

BRADY, District Judge.

This case arises out of a police investigation of the plaintiff, Gene Bibbins ("Bibbins"), which ultimately resulted in sending an innocent man to prison for 16 years. Bibbins' lawsuit is based on federal constitutional claims driven by 42 U.S.C. § 1983, as well as claims under Louisiana law.

A number of matters are pending before the court. First, defendant City of Baton Rouge ("the City") has filed a motion to dismiss on the basis of prescription (doc. 175), to which Bibbins has filed an opposition (doc. 178). The City has filed a reply brief (doc. 179). Secondly, all defendants have collectively filed a motion to strike the affidavit of one of Bibbins' designated expert witnesses, Gary L. Wells (doc. 157)

The court's jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1367. Oral argument is not needed.

### Statement of Facts

At approximately 2:00 a.m. on June 25, 1986, then-thirteen year old Kenya Canty was raped in a housing project in Baton Rouge, Louisiana. Canty was in bed inside of her aunt's apartment at the time. As Canty described the events, a man climbed through the window of the second floor bedroom. The man held a knife at Canty's throat and told her that he would kill her if she made any noise. After the rape, the man picked up a large Sony cassette radio with a broken handle and exited through the window. Canty got out of bed and begged the man to return the radio because it belonged to her little cousin. The man refused and left the apart-

ment. Canty testified that she watched the man leave her apartment and walk away.

Canty then rushed to her aunt, Judy Tasco, and told her what had transpired. Her family immediately contacted the police. Defendant Remington was the first officer to arrive at the scene. He obtained a description from Canty. Officer Remington's report advised that Canty described her attacker as (1) a black male; (2) with dark skin; (3) having a beard and mustache; (4) wearing a red and white striped shirt; and (5) wearing a gold earring in his left ear. The police report stated that Canty described her attacker as between the ages of 28–30. Another police report stated that she described her attacker as being between late 20's and early 30's. There is some dispute as to what other characteristics Canty described. The defendants maintain that Canty described her assailant as wearing blue jeans, although Canty testified that she told the officers he was wearing cloth cut-off shorts. Moreover, the defendants' police reports and their testimony stated that Canty described the man as having short hair. However, after Remington obtained a description, he gave it to defendant Davis, who left to look for the subject. The first suspect brought to Canty for a "show up" identification was Walter Jackson. Mr. Jackson was 17 years old, clean shaven, and wore his hair long in a "Jheri curl." Canty recognized Mr. Jackson and told the police that he was not her attacker.

A short while later, Davis saw Bibbins walking on a nearby street while carrying a cassette radio with a broken handle. Bibbins was walking in the direction of, and nearby, the apartment where the rape occurred. Bibbins was the only person out on the street at that hour, and he was carrying the exact same radio that the attacker took from Canty's room. Moreover, Bibbins fit the description of: (1) a black male; (2) wearing a red and white striped shirt; (3) wearing cut-off pants; and (4) wearing a gold earring in his left ear. Davis asked Bibbins what he was doing, and Bibbins told Davis that he was staying with his sister, and therefore presumably walking back to his sister's apartment.

At the same time back at Canty's apartment, Detective Jeri Gayle arrived and was with Canty and Remington attempting to get a statement from Canty. Before Gayle obtained any information about the rape, Davis announced on the police radio that he had apprehended a suspect. Davis gave the description of Bibbins, and at that point Remington interjected that Canty had said her rapist was wearing blue jeans.[1] Davis brought Bibbins to Canty's apartment in order to conduct another show-up identification.

Remington and Gayle then brought Canty to the front door of the apartment. Before Canty was asked to identify Bibbins, she saw the radio with the broken handle. The defendant officers contend that they did not intentionally show her the radio first, but that while exchanging it between officers Canty noticed it. In any event, Canty stated, "That's it, that's it" upon seeing the radio. The police thought Canty was referring to Bibbins, but she explained to them that she recognized the radio as being the one stolen from her room. Canty was then led to within a few feet of the police car whereupon Remington shined a flashlight on Bibbins and asked her if Bibbins was the rapist. Canty made a positive identification.

The police arrested Bibbins and no further investigation was pursued. No at-

---

1. Canty has stated at all times throughout the prior criminal case and the pending civil case that her attacker was wearing "cut-off" shorts.

tempt was made to search the apartment where Bibbins resided. The police did not continue to search for the knife. Moreover, Bibbins' genital area was not examined for evidence that he had participated in a rape. Canty, on the other hand, was transported to the hospital for a rape examination. Remington followed her to the hospital. Canty gave a taped statement at the hospital, but apparently that tape has disappeared.

Remington filed a police report which stated that Canty's description of the rapist matched Bibbins in every way except for the fact that Canty advised that the rapist was wearing blue jeans. The report failed to mention, however, that Bibbins was wearing cloth cut-off shorts. Remington's report also stated that Canty described Bibbins as between the ages of 28–30. As it turned out, Bibbins was 29 at the time of the arrest.

Davis also submitted a police report and an affidavit in support of probable cause to arrest. Both reports stated that Remington gave Davis a description of the rapist as a black male, between the ages of late 20's and early 30's, wearing a red shirt with white stripes, wearing blue jeans, having a beard, having short hair, wearing a gold earring in his left ear, and carrying a Sony radio with a broken handle. The reports, however, failed to mention the show-up of Walter Jackson, who was 17 years old and had longer hair.

Bibbins stood trial on charges of rape and burglary, and he was convicted of both by a jury. At trial, the State presented evidence that semen samples taken from

Canty's bed sheets, underwear, and rape kit were those of a "B secretor." The State had evidence that based on blood samples taken from Bibbins, he was a "B secretor." Apparently, only 6.4 percent of the population at the time were "B secretors." Moreover, Canty identified Bibbins as her attacker, and the jury heard the description she allegedly gave to the police, which almost completely matched the description of Bibbins. The jury found Bibbins guilty, and he ultimately served 16 years for the alleged crimes.

Unfortunately for Bibbins, however, was the fact that the jury convicted an innocent man. In 1998, Bibbins began writing to the Innocence Project in an effort to secure his release from prison. After investigation by the Innocence Project, biological evidence was located. In August 2002, the Innocence Project filed an application for testing under Louisiana's DNA statute. Three DNA tests, unavailable at the time of Bibbins' trial, proved that Bibbins did not rape Canty. On March 7, 2003, the state court exonerated Bibbins and vacated his convictions.[2]

Bibbins now brings a § 1983 action based on the alleged constitutional violations that resulted in his wrongful convictions. The court notes that while many defendants were originally made a party to this suit, Bibbins has dismissed his case against all defendants except the City, Annie Michelli, Remington, and Davis.[3]

### Discussion

### I. City of Baton Rouge's Motion to Dismiss on the Basis of Prescription

While the current summary judgments motions were pending, the Supreme Court

---

2. Emanuel Gordon has since been identified as the man that raped Canty.

3. See doc. 142, pg. 3 n. 1 ("Plaintiff is not making any argument opposing summary judgment against defendants Laysone, O'Brien, Gayle Chaney or Voinche personally and therefore is no longer pursuing a claim of supervisory liability against these defendants. In addition, in accordance with the Court's prior ruling that conspiracies must be between separate agencies, Plaintiff is no longer pursuing a conspiracy claim.")

issued its opinion in *Wallace v. Kato,* —— U.S. ——, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). The City argues that Bibbins' claims are time-barred under *Wallace.*

Before addressing *Wallace,* the court steps back in time to a case that *Wallace* elucidates, namely *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In *Heck,* the Supreme Court stated,

> [I]n order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . .

*Heck,* 512 U.S. at 486–87, 114 S.Ct. 2364 (footnote omitted). The *Heck* rule "delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn." *Wallace,* 127 S.Ct. at 1098.

In *Wallace,* the court granted certiorari to review a very narrow issue: on what date does the statute of limitations clock for a § 1983 claim of false arrest commence? *See Wallace,* 127 S.Ct. at 1094 n. 1. 1100. The court distinguished false arrest claims from those claims based on malicious prosecution (which was the context of *Heck* ) and claims based on the wrongful use of judicial process. *Id.* at 1096. In false arrest claims, damages only accrue through the time period in which detention is made without legal process. *Id.* Once a plaintiff's detention is made

pursuant to legal process, the false arrest comes to an end. *Id.* The court stated,

> "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself."

*Id.* (*quoting* W. Keeton, et al., *Prosser and Keeton on Law of Torts,* § 119, at 888).

■ Bibbins concedes that his Fourth Amendment false arrest claim, pursuant to § 1983, is time barred under the *Wallace* rule. The court finds the concession to be warranted. Unlike the torts of malicious prosecution or wrongful use of judicial process, success on a false arrest claim will not impugn an extant conviction. *Id.* at 1098. A false arrest ends, for purposes of the statute of limitations, when the plaintiff is held pursuant to legal process. At that time, however, there is no criminal conviction that a false arrest cause of action could impugn. *Id.* Thus, the *Heck* rule is inappropriate in the context of false arrest claims.

Under § 1983 claims, federal courts look to state law to determine the statute of limitations. La. Civ.Code. Art. 3492 provides for a one year prescription period for delictual actions. As Bibbins concedes, his false arrest claim is outside of the prescriptive period.

■ Bibbins' remaining claims are not time barred by *Wallace.* Those claims fall within the context of *Heck.* Bibbins' other claims, if successful, touch on matters that would impugn his conviction—(*i.e.* claims of fabrication of evidence, impermissibly suggesting an identification, failure to investigate). In *Castellano v. Fragozo,* 352 F.3d 939 (5th Cir.2003), the Fifth Circuit stated,

The heart of Castellano's claim is that the prosecution obtained his arrest and conviction by use of manufactured evidence and perjured testimony, actions attributable to it because Fragozo acted under color of state law. Castellano's proof directly implicated the validity of his conviction and therefore he could not proceed and limitations could not accrue consistent with the principles of *Heck* until the case was dismissed. . . .

*Castellano*, 352 F.3d at 959–60. The court likewise rules that the heart of Bibbins' remaining constitutional claims directly implicate the validity of his conviction. That conviction was impugned, and thus the *Heck* bar was lifted at that time.

Bibbins was exonerated of his rape conviction on March 7, 2003. Pursuant to *Heck* and *Castellano*, that is the date used to determine when Bibbins' constitutional claims accrued. His complaint was filed on February 23, 2004, less than one year after the claims accrued. Accordingly, only Bibbins' false arrest claim is time barred, and that claim is now dismissed.

## II. Admissibility of Bibbins' Expert Witness—Dr. Gary Wells

█ Bibbins has designated Dr. Gary Wells as an expert witness that will testify on the issue of whether the police defendants' show-up identification procedure was unduly suggestive. Dr. Wells also plans to testify on whether it was likely that the defendants fabricated evidence. The defendants argue that expert witness testimony on the issue of eyewitness identification is improper because it invades the province of the jury to make credibility determinations. The defendants posit that attacking eyewitness testimony must be done through cross examination, closing arguments, and jury instructions.

Bibbins maintains that Dr. Wells will not testify as to whether Canty made a correct identification. That issue is foreclosed; she made an incorrect identification because he was innocent. Bibbins argues that Dr. Wells is competent to testify on the issue of *why* Canty made a wrong identification, namely because of the use of an impermissibly suggestive show-up. Dr. Wells also plans to testify that the probability of Canty giving such a detailed description of her attacker, matching an innocent man in nearly every respect, was "astronomically low." Bibbins hopes to have Dr. Wells testify that the defendants must have fabricated the evidence by first apprehending Bibbins, and then later putting in their reports that Canty's description of her attacker exactly matched him.

In order to determine the competency of Dr. Wells' testimony as an expert witness, the court must look to the Federal Rules of Evidence. FRE 702 provides,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 703 states,

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are

otherwise admissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The Fifth Circuit accepts "the modern conclusion that the admission of expert testimony regarding eyewitness identifications is proper. . . ." *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir.1986). Many scientific studies attacking the accuracy of eyewitness identification are regarded as valid. *Id.* The Fifth Circuit has stressed that expert testimony is particularly helpful in the area of eyewitness reliability. *Id.* This is because there exists many common myths about the reliability of eyewitness identification. *Id.* For example, it is counter-intuitive that a witness' memory fails when he or she is under stress. *Id.* When witnessing a crime, many people have difficulty remembering or describing the features of strangers. *See United States v. Alexander*, 816 F.2d 164, 167–68 (5th Cir.1987) (finding that expert testimony is commonly used to aid jurors in the comparison of objects, such as the features of the human face). Ultimately, this court has "wide discretion" in permitting expert testimony on the issue of eyewitness identification. *Moore*, 786 F.2d at 1313.

While the defendants may be correct that a show-up identification by itself cannot turn an identification into an impermissibly suggestive one, there is more in this case. Canty saw the radio with the broken handle before she was shown Bibbins at the show-up. A juror may believe that seeing the radio would jog Canty's memory and help her remember what her attacker looked like. However, Dr. Wells points out that based on numerous studies and his own expert knowledge, the oppo-site is true. A show-up procedure in which the victim is shown "proceeds" from the crime has the counter-intuitive result of being highly suggestive. It often leads victims to incorrectly assume that the police apprehended the true perpetrator. In the case at bar, Canty indeed made an incorrect identification of her assailant.

Moreover, Dr. Wells' expert report and proposed testimony explains *why* Canty made an incorrect identification. His analysis points to the fact that by showing the radio coupled with a one-on-one show-up, as opposed to a line-up identification, the police impermissibly suggested to her that Bibbins was the attacker. To this day, Canty still believes that Bibbins was her attacker. Dr. Wells addresses this issue by relying on numerous established studies. An impermissibly suggestive identification, as Dr. Wells contends, has a "permanency" effect to it in the sense that the eyewitness can never get back to the original, pre-tainted memory. *See e.g., Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003).

The court holds that the requirements of FRE 702 and 703 have been satisfied, at least with respect to Dr. Wells' competency to testify as to whether the show-up procedure used in this case was impermissibly suggestive. It is undisputed that Dr. Wells is an expert on the subject of identification, his opinion is based on sufficient data, his methods are reliable by standards in the field, and he applies the methods reliably to the facts of the case at bar.

The defendants request in the alternative that the court limit Dr. Wells' testimony to only general factors or variables that might influence the reliability of hypothetical identifications. The defendants request that Dr. Wells be precluded from expressing an opinion as to the *specific* identification made by Canty or the show-up procedure used in this case. FRE 704

permits a qualified expert to express an opinion that "embraces an ultimate issue to be decided by the trier of fact." In light of this rule, and since the court finds Dr. Wells competent to testify on the identification in this case, the court holds that Dr. Wells is permitted to give his expert opinion as to whether the defendants' show-up procedure impermissibly suggested that Bibbins was Canty's attacker.

■ Dr. Wells' expert opinion on the issue of whether the police defendants fabricated evidence against Bibbins presents a different issue, however. Dr. Wells' opinion is that the odds that Canty gave the police a description of her attacker matching Bibbins in nearly every respect was astronomically low. His report states that a "conundrum" is presented because how could Canty have given such a detailed description of an innocent person? Dr. Wells' conclusion is that the police must have fabricated Canty's description of her attacker after Bibbins was apprehended—and after they had time to examine what he looked like.

Although the court has wide discretion in admitting expert testimony, *Moore*, 786 F.2d at 1313, permitting Dr. Wells' testimony on this issue would abuse that discretion. Dr. Wells' report does not explain the methodology used in arriving at his probability conclusion of "astronomically low." In his memorandum, Bibbins posits that Dr. Wells relied on his knowledge of Bayesian statistics. This, however, is not evident from Dr. Wells' expert report. The report does not indicate that he performed any statistical tests or calculations. Bibbins' reliance on the *Newsome* case is unpersuasive. Dr. Wells in that case conducted a photo array test and performed statistical calculations to determine the likelihood that three persons who saw the perpetrator would nonetheless identify an innocent man. Dr. Wells had an adequate

sample size and performed a chi-square test in order to calculate the probability that all three witnesses independently picking the innocent man out of a lineup by chance error was less than 1 in 1,000. Thus he could conclude that the officers must have manipulated the identification. *Newsome*, 319 F.3d at 305–06.

Moreover, Dr. Wells answers the "apparent conundrum" that he presents by assuming its answer. Dr. Wells asks, "How could this detailed description exactly fit Bibbins when he was not in fact the perpetrator?" He then goes on to state, "If we then assume that the description was actually obtained **after** the show-up rather than before the show-up, the conundrum is readily solved without resort to a coincidental explanation that has an astronomically low probability of happening." Thus, Dr. Wells first assumes that the description was obtained after the show-up, and then from this assumption answers the question presented. The question, however, seeks the very answer that Dr. Wells assumes. This is an example of *petitio principii*, or in other words, begging the question.

Dr. Wells' opinion on the issue of evidence fabrication is not based upon sufficient facts or data, nor is it the product of reliable principles and methods. Accordingly, the court sustains the defendants' objections to this part of Dr. Wells' expert opinion and testimony.

### III. Summary Judgment Motions

Summary judgment is proper when the moving party demonstrates a lack of a genuine issue of material fact and the party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir.1997). The moving party

has the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes shows an absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

After the moving party has met its initial burden, the non-moving party is required to set forth facts, by affidavits or otherwise, showing that a genuine issue of material fact exists. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir.1992). In determining whether summary judgment is proper, the court views the evidence, and all reasonable inferences drawn therefrom, in a light most favorable to the non-moving party. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988).

### 1. Michelli's Motion for Summary Judgment

Bibbins' § 1983 claims against Michelli are that Michelli fabricated evidence against him and withheld exculpatory evidence from the prosecuting attorney in his criminal trial. The court takes each claim in turn.

Michelli was employed as a fingerprint examiner-officer with the Baton Rouge Police department. It is undisputed that Michelli examined a set of latent fingerprints lifted from the crime scene and concluded in her report that the fingerprints were unidentifiable. Michelli's testimony at Bibbins' trial was that she was unable to identify Bibbins as a match to the fingerprint sample. Michelli also testified that she double checked her results with the Louisiana state crime lab and that the state crime lab reached the same results. However, it is undisputed that a Louisiana state police crime lab report made by Sybil Guidry showed a contrary result. Guidry's findings excluded Bibbins as a match.

■ A police officer's fabrication of evidence later used against a defendant at trial is an "indisputable" violation of the defendant's constitutional rights. *Castellano*, 352 F.3d at 955 (5th Cir.2003) ("The manufacturing of evidence and the state's use of that evidence along with perjured testimony to obtain the [defendant's] wrongful conviction indisputably denied him rights secured by the Due Process Clause."); *Young v. Biggers*, 938 F.2d 565, 570 (5th Cir.1991) (holding that a police officer's fabrication of evidence against an innocent defendant violates a clearly established constitutional right to due process).

The court does not agree with Bibbins that the summary judgment evidence in support of his claim of fabrication of evidence by Michelli is sufficient. Although Michelli's testimony concerning the crime lab results was inaccurate, the court is not persuaded that this supports a fabrication of evidence claim. To the contrary, the evidence is that Michelli's erroneous conclusion that the fingerprint analysis could not exclude Bibbins as a match was not intentional. Bibbins' own fingerprint expert, Ron Smith, testified that Michelli's mistake was not intentional.

■ Moreover, the allegedly fabricated evidence that Bibbins complains of is Michelli's report. The Fifth Circuit cases that Bibbins relies on in support of his claim all involve prosecutions in which the fabricated evidence was employed at trial, in a preliminary examination, or as a basis for indictment. *See Castellano*, 352 F.3d at 943 (an altered audio tape was admitted at trial); *Young*, 938 F.2d at 567 (the testimony of the actual robber was used at trial); *Geter v. Fortenberry*, 849 F.2d 1550, 1558 (5th Cir.1988) (a dentist's allegedly false report used as a basis for indictment and introduced at preliminary examination); *Pierce v. Gilchrist*, 359 F.3d 1279, 1282 (10th Cir.2004) (a chemist's falsely

identified hair samples used at trial). In the case *sub judice*, Michelli's report was not used at trial, at a preliminary examination, or to obtain an indictment. Both Guidry and Smith testified that when there is a disagreement among latent examiners, the examiner that is called to testify at trial must testify to her *own* opinion. This is what Michelli did. Bibbins' fabrication claim is based only on speculation, not on *reasonable* inferences. Accordingly, that claim is dismissed.

■ The court agrees with Bibbins, however, that his *Brady* claim—"withholding of evidence"—can survive summary judgment. The Fifth Circuit has repeatedly recognized the existence of a § 1983 cause of action for a police officer's suppression of material exculpatory evidence. *Mowbray v. Cameron County, Tex.*, 274 F.3d 269, 278 (5th Cir.2001); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir.1992) (finding a police officer's "deliberate failure to disclose ... patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983"); *Geter*, 849 F.2d at 1559 (holding that a police officer is liable under § 1983 if he "deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles").[4]

In the case at bar, there is evidence that Michelli's report conflicted with Guidry's report. There is also evidence that Michelli believed Guidry was her supervisor—although Guidry testified to the contrary—and that she compared her report to that of Guidry's report. Thus there his evidence that Michelli was in possession of Guidry's report. This alone proves nothing, but in this case there is more. The evidence shows that Guidry's report exculpated Bibbins. Thus, the inference is that Michelli was in possession of exculpatory evidence.

The prosecuting attorney at Bibbins' trial testified that the district attorney's office never received any exculpatory evidence from the crime lab or from Michelli. The evidence can support a finding that Michelli knew of the exculpatory report, recognized that her findings contradicted that report, and withheld disclosure of the exculpatory report so that her findings could not be contradicted.

Furthermore, Michelli testified that her fingerprint conclusions matched that of the state crime lab's conclusions. It is undisputed that Michelli's testimony in this regard was incorrect. Although Michelli's false testimony is entitled to absolute immunity against damages liability. *Briscoe v. LaHue*, 460 U.S. 325, 345–46, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), her false testimony may be considered as circumstantial

---

4. Michelli insists that *Mowbray v. Cameron County, Tex.*, 274 F.3d 269 (5th Cir.2001), forecloses Bibbins' *Brady* claim. The court acknowledges that the *Mowbray* court stated "Mowbray cites, and our research reveals, no case extending *Brady* to police officers or lab technicians." *Mowbray* 274 F.3d at 278. The Fifth Circuit dismissed a claim that police officers violated *Brady* when they failed to hand over exculpatory evidence to Mowbray's counsel. However, the court also dropped a footnote stating, "Mowbray does not allege, nor do the facts support a finding, that [the officers] ... deliberately concealed exculpato-

ry evidence from all parties, including the prosecution." *Id.* at 278 n. 5. The court noted that a *Brady* claim exists in the latter scenario under the analysis in *Geter v. Fortenberry*, 849 F.2d 1550, 1558 (5th Cir.1988).

In the case at bar, Bibbins does not claim that Michelli failed to disclose the state crime lab report to his counsel, but rather that she failed to disclose this exculpatory evidence to the prosecuting attorney at the time of his trial. Thus, Bibbins' claim falls squarely into footnote five of the *Mowbray* opinion, and therefore he does in fact have a *Brady* claim.

evidence on the issue of withholding exculpatory evidence.[5]

Michelli next argues that even if there is evidence that she deliberately withheld exculpatory evidence, Bibbins' claim fails for want of causation. Michelli posits that Guidry's report was not exculpatory because it did not eliminate him as the rapist. Thus Michelli argues that Bibbins cannot prove that he would not have been convicted "but for" Michelli's failure to testify that the latent prints did not match him.

The court disagrees. The crime lab report, while not identifying the rapist, was exculpatory evidence. The latent prints were lifted from, a window fan in Canty's room. At the time of trial, all sides believed that the prints found on the fan belonged to the rapist. During closing argument, the prosecutor argued that Bibbins could not be excluded as the source of the prints. Evidence that Bibbins did not match the prints lifted from the window fan would have created reasonable doubt. Moreover, Michelli's reliance on the "overwhelming" evidence of guilt is not persuasive in this case because as will be shown *infra*, there are fact disputes as to whether the remaining police defendants fabricated and withheld evidence against Bibbins. Thus, there are fact disputes for trial as to whether the "overwhelming evidence" that Michelli relies on even occurred.

The court is guided by the general notion that causation is usually a question of fact and therefore within the province of the jury.[6] *See e.g., Bertucci Contracting Corp. v. M/V/ANTWERPEN*, 465 F.3d 254, 259 (5th Cir.2006). Accordingly, the court finds a genuine issue of material fact in dispute as to whether Michelli withheld exculpatory evidence from the prosecutor.

Michelli next argues that she is entitled to qualified immunity. The court disagrees. Qualified immunity involves a two-step analysis. First, the court determines whether the plaintiff has established a violation of a clearly established constitutional right at the time of the events in question. *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562 (5th Cir.2003). If the plaintiff can get past the first step, the next step requires the plaintiff to prove that the official acted objectively unreasonable in violating the plaintiff's clearly established constitutional right. *Id.*

The court finds that *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), clearly established a constitutional violation of due process when police officers withhold exculpatory evidence from the prosecutor, so that such evidence cannot be delivered to the defense. *See Newsome v. McCabe*, 256 F.3d 747, 752–53 (7th Cir.2001) (finding that *Brady* clearly established that officers could not withhold information that the plaintiff's fingerprints did not match those at the crime scene). Moreover, the degree of specificity required from prior caselaw must depend, at least in part, on the character of the challenged conduct. Thus, the more egregious the conduct in light of established constitutional principles, the less specificity is required from prior caselaw to clearly establish the violation. *See*

---

5. Michelli directs the court's attention to Guidry's deposition testimony in which Guidry testified that she disclosed the crime lab report to the district attorney's office, but that the district attorney's office must have misplaced it. This, however, only shows a dispute of fact.

6. The court agrees with Michelli that the element of causation is susceptible to summary judgment under Rule 56. However, in this case, there is a material dispute of fact as to whether Michelli's failure to disclose the exculpatory crime lab report caused Bibbins' conviction.

*e.g., Vinyard v. Wilson,* 311 F.3d 1340, 1352 (11th Cir.2002) (noting that the "constitutional provision may be so clear and the conduct so bad that caselaw is not needed to establish that th[e] conduct cannot be lawful").

■■■ There is a dispute of fact as to whether Michelli deliberately withheld the crime lab report from Bibbins in 1986. The court finds that it was clearly established in 1986 that an officer violated a clearly established right of due process when he or she failed to disclose exculpatory evidence to the prosecutor's office. Thus, Bibbins has overcome the first step of qualified immunity.

As for the second step, Michelli cannot seriously argue that if she deliberately withheld the results of the crime lab report, she nonetheless acted *objectively reasonable* in doing so. Deliberate withholding of exculpatory evidence can never constitute *reasonable* conduct. *See e.g., Geter,* 849 F.2d at 1559 (noting that "a police officer cannot avail himself of a qualified immunity defense if he ... deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles"); *Pierce,* 359 F.3d at 1299–1300 (denying qualified immunity to forensic examiner in § 1983 wrongful conviction suit as no forensic examiner in 1986 could have "labored under any misapprehension that the knowing or reckless ... omission of evidence was objectively reasonable"); *Newsome,* 256 F.3d at 752–53 (denying qualified immunity to

officer that failed to report to prosecuting attorney that defendant's fingerprints did not match those lifted from crime scene). Accordingly, the court refuses to shield Michelli with qualified immunity.

Finally, the court considers Michelli's argument that Bibbins' state law negligence claims against her are barred by the discretionary function immunity. La.Rev. Stat. 9:2798.1 bars negligence claims against governmental employees whenever the act complained of is one in which the governmental employee had discretion to act and the action taken was within the employee's lawful power. *Gregor v. Argenot Great Cent. Ins. Co.,* 851 So.2d 959, 964 (La.2003).[7]

■■■ While Michelli is correct that she had discretion to form her "expert" opinion as to the fingerprint analysis, she did not have discretion to withhold exculpatory evidence from the district attorney's office. This issue has already been analyzed *supra*—Bibbins has a *Brady* claim against Michelli. *Geter,* 849 F.2d at 1559. Discretionary function immunity does not apply when the government official has no discretion or choice. *Hardy v. Bowie,* 744 So.2d 606, 613 (La.1999); *Caillouet v. City of New Orleans,* 834 So.2d 521, 525 (La.Ct. App.2002). Accordingly, Michelli is not entitled to the immunity.[8]

### 2. Davis' and Remington's Motion for Summary Judgment

Bibbins' federal claims against defendants Davis and Remington are that

---

7. Bibbins has failed to respond to this argument.

8. Michelli raises one final argument to which Bibbins, again, fails to respond. Michelli argues that Bibbins' state law intentional tort claims must fall because they are premised on Michelli fabricating evidence and/or withholding exculpatory evidence by testifying falsely. As the court has ruled, Michelli is not entitled

to summary judgment on Bibbins' *Brady* claim that she withheld evidence. Accordingly, Michelli's premise is now flawed. Therefore the court will defer on ruling as to the validity of Bibbins' intentional tort claims. However, Michelli will be permitted to file another motion for summary judgment on the state law claims (with the premise that Bibbins has a *Brady* claim).

they (1) fabricated evidence; (2) failed to disclose exculpatory evidence to the prosecuting attorney; (3) employed an unconstitutionally suggestive identification procedure; and (4) violated his right to due process by deliberately ignoring exculpatory evidence or by conducting a reckless investigation. The court takes each in turn.

### a. Fabrication of Evidence

■■ "The manufacturing of evidence and the state's use of that evidence ... to obtain [the defendant's] wrongful conviction undisputably denie[s] him [of] rights secured by the Due Process Clause." *Castellano*, 352 F.3d at 955; *Young*, 938 F.2d at 570. "The Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The Supreme Court in *Napue* stated that "implicit in any concept of ordered liberty," is a right to not be deliberately subjected to trial based on "false evidence." *Id.; see also Washington v. Wilmore*, 407 F.3d 274 (4th Cir.2005); *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir.2004); *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir.2000).

The summary judgment evidence discloses the following. Officer Remington filed a police report which stated that Canty had given him a description of the rapist prior to Bibbins being arrested. The police report stated Canty's description as: (1) a black male, (2) approximately 28–30 years old, (3) wearing a red shirt with white stripes; (4) blue jeans; (5) short hair; (6) dark skin; (7) earring in left ear; (8) beard; and (9) mustache. Officer Davis submitted a report and affidavit in support of probable cause in which he stated that Officer Remington gave him a description of the alleged rapist being (1) a black male; (2) late 20s to early 30s; (3) wearing a red shirt with white stripes; (4)

blue jeans; (5) beard; (6) short hair; (7) gold earring in left ear; and (8) carrying a Sony radio with a broken handle. When Bibbins was apprehended, his identifying features included (1) a black male; (2) 29 years old; (3) wearing a red shirt with white stripes; (4) gray cutoff shorts; (5) short hair; (6) dark skin; (7) gold earring in left ear; and (8) carrying a Sony radio with a broken handle. The fact that Bibbins was wearing gray cutoff shorts, while Canty advised he was wearing blue jeans, was not included in any of the police reports.

This court has already concluded that Dr. Wells is not competent to testify *as an expert* as to the "astronomically low" probability that such a detailed description could have matched an innocent man. However, this does not mean that a jury cannot infer that the chances of this coincidence occurring are indeed "astronomically low." Bibbins' position is that Canty provided Remington and Davis with a *different* description of her alleged attacker, and that Remington and Davis later falsified their reports to match Bibbins' characteristics. Under the circumstances of this case, such inferences are not unreasonable. The fact remains that Bibbins was not the rapist. Thus the question is raised, how could Canty have given a description that nearly matched Bibbins to a tee, when Bibbins was not the one that who her? One reasonable possibility is that the defendants fabricated evidence to make a case against Bibbins. This is a genuine issue for the jury to resolve.

Moreover, the first person brought to Canty for identification purposes on the night of the rape was Walter Jackson. Mr. Jackson was 17 years old, clean shaven, and wore his hair long in a "Jheri curl." Why would the officers have presented Mr. Jackson for identification purposes when their police reports stated that

Canty described her rapist as between 28–30, with a beard, and with short hair? That the defendants brought Mr. Jackson, a man that did not fit the "description," for an identification is evidence that Canty did not initially give the detailed description of Bibbins that was attributed to her. In addition, after Canty was transported to the hospital for examination, she allegedly made statements that were tape recorded. Her taped statements have mysteriously disappeared.

The defendants spend much time pointing out facts showing that fabrication of evidence could not have occurred. All that does, however, is point out a material dispute of facts for the jury to decide. The court is satisfied that the evidence, along with the reasonable inferences drawn therefrom, is sufficient to preclude summary judgment.[9]

### b. Failure to Disclose Exculpatory Evidence

As discussed *supra*, the Fifth Circuit has recognized the existence of a § 1983 cause of action for a police officer's suppression of exculpatory Brady material from prosecutors. *Sanders*, 950 F.2d at 1162 (stating a police officer's "deliberate failure to disclose . . . patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983"); *Geter*, 849 F.2d at 1559. The court agrees with Bibbins that because genuine issues of material fact remain at issue with regards to Remington and Davis fabricating evidence, there are material fact issues in dispute as to whether Remington and Davis withheld evidence from the prosecuting attorney. The logic

is as follows. If the truth is that Canty gave an initial description of her rapist as being something different than matching Bibbins' characteristics, then this evidence was material and exculpatory. Thus, the defendants had a duty to disclose the "true" description to the prosecuting attorney. *Sanders*, 950 F.2d at 1162. It is clear that the prosecuting attorney did not have any information that Canty gave a description that did not match Bibbins. Thus, Bibbins' *Brady* claim cannot be dismissed, at least not until his fabrication of evidence claim is settled—and that claim must go to the jury. Thus, there is a material dispute of fact as to whether Remington and Davis failed to disclose Brady material to the prosecuting attorney.

### c. Impermissibly Suggestive Identification

To begin, the court notes that Bibbins has not explicitly pleaded a due process claim based on an impermissibly suggestive identification. Bibbins asserts that while he did not state a separate claim of impermissibly suggestive identification, it should be included as a subset of his Fourteenth Amendment Due Process claim for a denial of a fair trial.

The federal rules of civil procedure envision notice pleading, not fact pleading. Thus claims need not specify in exact detail every possible theory of recovery, so long as they give fair notice of the claims to the defendants. *See Thrift v. Estate of Hubbard*, 44 F.3d 348, 356 (5th Cir.1995) (*citing Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Colle v. Brazos County*, 981 F.2d 237, 243 (5th

---

9. The defendants have quoted the following in support of summary judgment: "If a frog be found in the party punch bowl, the presence of a mischievous guest, but not the occurrence of spontaneous generation may reasonably be inferred." The court finds the quote applicable, but not in support of the defendants' position. There is sufficient evidence for the jury to find that mischievous guests were present, namely Officers Remington and Davis.

Cir.1993) ("A plaintiff's complaint ordinarily need only be a short and plain statement that gives the defendant notice of what the claim is and the grounds upon which it rests."); *Bechtel v. Robinson*, 886 F.2d 644, 650 n. 9 (3d Cir.1989) ("[A]s long as the issue is [pleaded], a party does not have to state the exact theory of relief in order to obtain a remedy."). The simplicity required by Rule 8 recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Conley*, 355 U.S. at 47, 78 S.Ct. 99.

The court finds that the complaint gives "fair notice" to the defendants that Bibbins claims that he was subjected to an unconstitutional identification. The court has independently reviewed the complaint, and it finds that the facts alleged in paragraphs 34–38 are sufficient to put the defendants on "notice" that Bibbins takes issue with the show-up identification. Moreover, the court agrees with Bibbins that there is no prejudice in asserting this claim because that the identification would be challenged was apparent from the depositions and from the expert report of Dr. Wells, the latter being vigorously objected to by the defendants on substantive grounds. Therefore, the court will not require Bibbins to amend his complaint, as it finds his complaint sufficient under the liberal notice pleading requirement contemplated by Rule 8.

The court now turns its attention to the merits of Bibbins' improper identification claim. The Fifth Circuit recognizes a § 1983 claim based on the use of an unconstitutionally suggestive identification procedure. *Geter*, 849 F.2d at 1559. "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "It is the likelihood of misidentification which violates a [petitioner's] right to due process...." *Id.* Therefore, "the intentional use of unduly suggestive identification procedures can support a § 1983 action." *Sanders*, 950 F.2d at 1160.

The Fifth Circuit employs a two-prong test in determining whether a particular identification violates due process. First, the court determines whether the identification was "unduly suggestive." *Joshua v. Maggio*, 674 F.2d 376, 378 (5th Cir.1982). If so, the court then considers whether the identification procedure was so unreliable that it gave rise to a "likelihood of irreparable misidentification." *Id.; see Allen v. Estelle*, 568 F.2d 1108, 1111 (5th Cir.1978); *see also Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony...."); *McGee v. Estelle*, 632 F.2d 476, 477 (5th Cir.1980).

The Fifth Circuit has admonished officers for using the practice of show-up identifications. *Joshua*, 674 F.2d at 378 ("It is an understatement to say that 'the practice of showing suspects singly to persons for the purpose of identification ... has been widely condemned.'") (*quoting Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)); *Allen*, 568 F.2d at 1112 ("This Court, along with other circuits, has shown reluctance to encourage the use of showups.") (footnote omitted).

In *Allen*, Bobby Ray Allen was suspected of robbing a motel clerk at gunpoint. After Allen was apprehended, the police requested that the clerk come to the police

station to recover his stolen goods, which included a television, and to make an identification. Once inside the station, but before identifying Allen, the clerk saw his television sitting on a counter. Thereafter, the clerk was asked to make a positive identification of the robbers, and he did so, selecting Allen in the process. *Allen,* 568 F.2d at 1110.

The Fifth Circuit found the show-up in *Allen* to be "close to the mark as unnecessarily suggestive." *Id.* at 1113. Although the court stated that it would "assume, without deciding" that the "unduly suggestive" prong was satisfied, the court in another part of its opinion stated "[u]ndoubtedly, the confrontation procedure utilized by the police in this case was inherently suggestive." *Id.* at 1112. Ultimately, however, the court found that Allen failed to prove the second-prong, namely that his identification was unreliable. *Id.* at 1114.

■ Defendants Remington and Davis are correct in that the use of a "show-up" identification, without more, does not violate due process. The court finds this issue conclusively settled in *Neil. Neil,* 409 U.S. at 198, 93 S.Ct. 375 (stating that "the admission of evidence of a showup without more does not violate due process."). However, there is more in this case than just evidence of a show-up.

■ In the case at bar, Bibbins has brought forth evidence, either direct or from reasonable inferences, that the defendant officers showed Canty the Sony radio before showing her Bibbins. Indeed, the officers admit that Canty identified the radio *before* she saw Bibbins at the show-up.

This is like *Allen,* where the victim was shown the proceeds of the crime *ante* making a positive identification. The strong admonition against the use of showups, coupled with the fact that Canty was shown the proceeds of the crime, leads this court to believe that the Fifth Circuit would find the identification in this case to be "unnecessarily suggestive." *Cf. McGee,* 632 F.2d at 478 (relying on fact that police did not show victim proceeds of crime until after the lineup in concluding that identification was not unnecessarily suggestive). The procedure employed by the defendants in this case "encouraged [Canty] to identify [Bibbins] as the suspect." *See e.g., Amador v. Quarterman,* 458 F.3d 397, 413 (5th Cir.2006).

The court must therefore move on to the second prong, namely whether the show-up caused an "unreliable" identification. The factors considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Passman v. Blackburn,* 652 F.2d 559, 569–70 (5th Cir.1981); *McGuff v. Alabama,* 566 F.2d 939, 941 (5th Cir.1978).

The first factor is neutral. While the evidence shows that the rapist was on top of Canty and unmasked, giving her ample opportunity to look at him, there is also evidence that the rape occurred in an unlit room at 2:00 a.m. in the morning. The second factor cuts in favor of the defendants. The evidence is, of course, that Canty was restrained from moving during her rape. Her attention would therefore be focused on the rape and the rapist.

The third factor is dependent on resolution of Bibbins' fabrication of evidence claim. As analyzed *supra,* Officers Remington's and Davis' reported description of the rapist may have been fabricated. If so, then this factor would cut in favor of

Bibbins. As to the fourth factor, Canty has no doubt in her mind that Bibbins raped her. Canty states that she was sure at the time of the show-up, and that she is equally sure now. However, there is a fact dispute as to why Canty is so positive that Bibbins raped her, when in reality he did not. Bibbins' expert witness Dr. Wells has competent evidence with which to testify that the showing of the radio before being asked to identify Bibbins was the cause of her certainty. As Dr. Wells states in his report, "the radio not only increased the chances that Canty would identify Bibbins, but also led her to be positive in the identification."

Finally, the fifth factor cuts in favor of the defendants. In the case at bar, Bibbins was identified by Canty within two hours of the rape. In *United States v. Merkt,* 794 F.2d 950, 959 (5th Cir.1986), the Fifth Circuit found that an identification made "only hours" after the incident could not constitute a "substantial passage of time which could have affected the reliability of the identification." *Merkt,* 794 F.2d at 959; *Joshua,* 674 F.2d at 378 ("Finally, the time between the crime and the confrontation was only two hours, scarcely enough time to affect the reliability of the identification.").

After consideration of the above factors, this court cannot conclude that as a matter of law, the show-up identification in this case did not give rise to a likelihood of irreparable misidentification. The record, when viewed in a light favorable to Bibbins, shows that Canty initially gave a description of the rapist that did not match Bibbins, and that notwithstanding this difference, the defendant officers picked up Bibbins, brought him in the backseat of a police car to the crime scene, showed Canty the stolen radio, and then finally asked Canty to identify Bibbins (while Bibbins was handcuffed and in the backseat of a

police car). The court holds that there are at least sufficient facts in dispute for a jury to conclude that the show-up identification was unreliable, and therefore violated Bibbins' right to due process.

### d. Failure to Investigate

■ Officers Remington and Davis misconstrue Bibbins' failure to investigate claim. The court agrees that the Constitution does not require an officer to perform an error-free investigation, nor does it require officers to independently investigate every claim of innocence. *Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). However, a police officer may be liable under § 1983 if he or she deliberately ignored exculpatory evidence or conducted a reckless investigation. *See Sanders,* 950 F.2d at 1162. This is the heart of Bibbins' claim. He has brought forth evidence that Officers Remington and Davis withheld exculpatory evidence and conducted a reckless investigation.

The record, when viewed in a light most favorable to Bibbins, shows that the defendants unconstitutionally conducted a show-up, falsified police reports, and withheld major discrepancies between Canty's initial description of her rapist and Bibbins' physical characteristics. Again, the court reminds the defendants that this is a motion for summary judgment, and the court does not weigh the evidence. The court only looks for whether the evidence, and all reasonable inferences drawn therefrom, is sufficient to send the case to a jury. In this case, the evidence is sufficient. If the jury finds merit in Bibbins' fabrication of evidence claim, it can easily find merit to his claim that the defendants conducted a reckless investigation and deliberately ignored exculpatory evidence.

### e. Qualified Immunity

Officers Remington and Davis have also raised the affirmative defense of qualified

immunity to each of Bibbins' claims. It is well-settled that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether qualified immunity applies should be resolved at the earliest possible stage of the litigation. *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir.1989).

■ While a plaintiff need not anticipate a qualified immunity defense in his complaint, once the defense is raised, he must support his claim with precision and factual specificity. *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir.1995). The defendants argue that Bibbins has failed to meet the heightened pleading requirements to rebut the qualified immunity defenses. However, the court need not analyze the issue because it finds the briefing in this case sufficiently address qualified immunity. *See Truvia v. Julien*, 187 Fed. Appx. 346, 349–50 (5th Cir.2006) (holding that heightened pleading requirement normally accomplished by a Rule 7(a) reply is unnecessary when there is complete briefing on the immunity issue).[10]

Moreover, the nature of Bibbins' claims makes qualified immunity inapplicable. It is axiomatic to say that no reasonable officer would fabricate evidence, withhold material exculpatory evidence, or ignore exculpatory evidence and conduct a reckless investigation. All notions of fairness and justice must at a minimum incorporate this principle as a fundamental premise. *See Napue*, 360 U.S. at 269, 79 S.Ct. 1173 (holding that "implicit in any concept of ordered liberty" is a right to not be deliberately subjected to trial based on "false evidence").

■ In addition, the identification conducted in the present case, if found by a jury to be unconstitutionally suggestive, forecloses a qualified immunity defense. *See Geter*, 849 F.2d at 1559 (holding that a police officer's "procure[ment of a] false identification by unlawful means" "violates clearly established constitutional principles" and therefore precludes the application of qualified immunity). The court holds that as a matter of law, defendants Remington and Davis are not entitled to the defense of qualified immunity.[11]

### 3. City of Baton Rouge's Motion for Summary Judgment

The City moves for summary judgment on Bibbins' *Monell* claims. *See Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). It is now well-settled that a municipality may not be held liable under § 1983 on the basis of respondeat superior. *Id.* Instead, in order to establish municipal liability, the plaintiff must prove that his rights under federal

10. The court also points out that the defendants do not request a Rule 7(a) reply be filed by Bibbins. *See* Fed.R.Civ.P. 7(a), *Advisory Committee Notes—1937, Note to Subdivision (a)* ("A reply is sometimes required to an affirmative defense in the answer ... In other jurisdictions no reply is necessary to an affirmative defense in the answer, but a reply may be ordered by the court.").

11. Finally, Officers Remington and Davis argue that Bibbins' state law claims should be dismissed because his state law claims are "subject to the same factual defenses and qualified immunity" as his federal claims. *Memorandum in Support of Summary Judgment*, (doc 119), at pg. 13. The argument is moot in that Bibbins' federal claims survive summary judgment. The defendants have not adequately briefed the state law claims otherwise, and therefore the court will not consider them.

law were violated and that the municipality's policy or custom caused the violation. *Burge v. St. Tammany Parish,* 336 F.3d 363, 369 (5th Cir.2003). The plaintiff will prove municipal liability by showing "either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers 'with 'deliberate indifference' as to its known or obvious consequences.' " *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 309 (5th Cir.2004) (*quoting Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

The City argues that there is no summary judgment evidence that any policy of the City was responsible for the alleged violations of Bibbins' constitutional rights. Bibbins counters by arguing two distinct theories of *Monell* liability: (1) the City's failure to train and supervise Officers Remington and Davis on investigative practices, including how to conduct identification procedures, how to comply with *Brady* obligations, and how to conduct a reasonable investigation; and (2) the City's failure to train and supervise Officer Michelli in how to conduct a fingerprint examination.

The Supreme Court has stated "that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In determining deliberate indifference on the basis of failure to train, the court looks to whether the city's policymakers knew to a "moral certainty" that their police officers would be required to undertake certain common investigative actions. *Id.* at 390,

109 S.Ct. 1197 (stating that because city policymaker's know to a moral certainty that police must chase fleeing felons, failure to train officers on constitutional limitations imposed on use of deadly force against fleeing felons could amount to "deliberate indifference" to constitutional rights).

Normally "deliberate indifference" based on a failure to train theory requires proof of a pattern of constitutional violations. *See e.g., Roberts v. City of Shreveport,* 397 F.3d 287 (5th Cir.2005); *Cousin v. Small,* 325 F.3d 627, 637 (5th Cir.2003) (stating that "to satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations"). The Supreme Court, however, has carved out a very narrow exception to the general rule, namely the "single incident" exception. *Id.* at 295 (*citing Bryan County,* 520 U.S. 397, 117 S.Ct. 1382). In analyzing the single incident exception, the Fifth Circuit stated,

> In [*Bryan* ], the Supreme Court clarified pervious decisions that allow, in certain extreme circumstances, a single act by a municipal employee to form the basis of municipal liability apart from a pattern of unconstitutional activity. To rely on this exception, a plaintiff must prove that the "highly predictable" consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the "moving force" behind the constitutional violation.

*Id.* at 295. The court went on to state, "[t]his circuit, in conformity with the Supreme Court's jurisprudence, has been highly reluctant to permit this exception to swallow the rule that forbids mere respondeat superior liability." *Id.*

 The City does not dispute, nor does anything in the record indicate, that Baton Rouge policymakers did not know to

a "moral certainty" that police officers routinely conducted suspect identifications and disclosed exculpatory evidence. Thus, the question turns on whether the City's failure to train its officers in these respects amounted to deliberate indifference?

Bibbins acknowledges, as he must, that his *Monell* claims rest on the very narrow "single incident" exception. There is in fact no summary judgment evidence showing that the City acquiesced in a pattern of constitutional violations by its police officers. The court first tackles the issue of the lack of training with respect to identification procedures.

There is no dispute that identifications are routinely used in the vast majority of criminal investigations. The City is quick to point out that the Louisiana Law Enforcement Handbook in 1986 explained how to conduct a proper identification. However in this case, the summary judgment evidence shows that the City provided its officers with practically no training whatsoever in conducting identifications. The reasonable inferences drawn from the evidence, as discussed *supra*, can support a finding that Officers Remington and Davis showed Canty proceeds of the crime (the broken radio) before asking Canty to make an identification of Bibbins. This is the exact sort of conduct that is avoidable with proper training. The court therefore holds that a reasonable jury could find that the total lack of training was the moving force that made it "highly predictable" that an unconstitutionally suggestive show-up would occur.

■ Bibbins' *Monell* claims with respect to the failure to train on *Brady* requirements and conducting a proper investigation, however, must succumb to summary judgment. Even assuming that the City provided no training on Brady

obligations, any lack of training in this respect cannot be said to be the "moving force" behind Bibbins' constitutional violations. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. As noted *supra,* Bibbins' *Brady* claim is that the officer defendants *intentionally* failed to disclose exculpatory evidence to the prosecuting attorney. This is not the type of conduct that falls within the ambit of the extremely narrow "single incident" exception because such conduct does not make a constitutional violation "highly predictable."

Officers for the City presumably conducted hundreds of investigations, and hundreds of times they disclosed evidence to the prosecuting attorney, both inculpatory as well as exculpatory. The City's officers were adequately trained on the general nature of police work.[12] It is illogical to say that although training was provided, and that no other foul incidents arose with respect to disclosure of *Brady* material, the City should still have been on notice that the isolated *intentional* acts by certain officers would have occurred. This is unlike the total lack of training with respect to identifications. With identifications, even unintentional conduct can result in a violation of due process. Thus a lack of training makes it "highly predictable" that due process will be violated. With intentional conduct, such as *Brady* violations, no amount of training would stop a rouge officer from violating one's rights.

Moreover, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Harris,* 489 U.S. at 390–91, 109 S.Ct. 1197. In this case, the alleged *Brady* violations occurred not from

---

12. *See* City's Exhibits B, C, D, E, F, G, H, I and J.

a failure to train, but rather through the individual officers' *intentional* actions.

Bibbins' claim of failure to conduct an adequate investigation also cannot rest on a failure to train theory. Such a claim would surely swallow the general rule that a pattern of violations must be proved.

There is no question that the City provided training to its officers on police work and investigations. Bibbins true claim is that the City should have offered *better or more* training. But "[i]t is not enough to say that more or different training … would have prevented the result of the ill-fated" investigation in order to attach *Monell* liability. *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 386 (5th Cir.2005). If Bibbins is permitted to base *Monell* liability on a failure to conduct an investigation claim, every single criminal defendant will raise *Monell* claims in an attempt to attribute any foul-ups by the police to a failure to train on investigatory techniques. The *Harris* court warned that municipal liability was not to be so open-ended *lest* the municipality be open to respondeat superior liability. *Harris*, 489 U.S. at 392, 109 S.Ct. 1197. The single incident exception is very narrow, and the court holds that it does not encompass Bibbins' *Monell* claims based on failure to train vis a vis *Brady* obligations or conducting of investigations.

Finally, the court addresses Bibbins' last *Monell* claim—his claim that the City failed to train Michelli in latent fingerprint examination. Bibbins' claim again is based on the "single incident" exception, on which it cannot lie. Bibbins acknowledges that unlike the lack of training on identification, the City did train Michelli on fingerprint examination. However, as Bibbins' expert Ron Smith points out, Michelli's fingerprint examination abilities in 1986 suffered from inadequate or incompetent training.

In *Brown*, the Fifth Circuit found the single incident exception to apply when there was an utter failure to train and supervise. *Brown v. Bryan County, Okla.*, 219 F.3d 450, 462 (5th Cir.2000). The Fifth Circuit later stated in *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273 (5th Cir.2002), that the single incident exception applied in *Brown* because the county in that case "failed to provide *any* training or supervision for a young, inexperienced officer with a record of recklessness." *Cozzo*, 279 F.3d at 288 (internal quotation marks and citations omitted). The court also noted that "there is a difference between a *complete failure to train* as in [*Brown*] and a failure to train in one limited area."

Unlike *Brown*, Michelli's training was not a *complete* failure to train on fingerprint examination. Perhaps the training was inadequate, but the court nonetheless thinks that the Fifth Circuit would not permit the single incident exception to apply to Michelli's training. While Michelli was a young and inexperienced officer in 1986, there is no evidence that she had a record of reckless behavior. *Cf. Brown*, 219 F.3d at 462. Accordingly, the court holds that the City did not act with deliberate indifference with respect to a failure to train Michelli.[13]

## IV. Motion *In Limine* to Admit Evidence of Conviction and Sentence

■ The final motion before the court is filed by all defendants, and it urges the court to admit evidence of an unrelated rape conviction and sentence. The record shows that on November 9, 2004, Bibbins entered an *Alford* plea, pursuant to *North*

---

**13.** The court notes that the City does not address Bibbins' state law claims. Accord-ingly, the court refrains from analyzing those claims.

*Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), to the charge of rape in an unrelated case that allegedly occurred in January 1985. In exchange for his plea, the state recommended a sentence of incarceration for a period of five years, eleven months, and twenty days. The court followed the state's recommendation and imposed the sentence. Furthermore, the court ordered the sentence to begin on June 26, 1986 and run until June 17, 1992, and also specifically ordered that the sentence was "to run concurrent with any other time [Bibbins was] then serving." Bibbins was serving a sentence for the rape conviction in Canty's case during that time period.

The defendants posit that Bibbins' 2004 conviction is admissible under F.R.E. 404 and 609.

The court agrees with the defendants that Bibbins' conviction is 404(b) evidence. Rule 404(b) provides in pertinent part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes...." The "other purposes" language in the rule allows for the admission of prior bad acts to prove damages, or the lack thereof. *See Lewis v. District of Columbia,* 793 F.2d 361, 363 (D.C.Cir.1986). The defendants contend, and the court agrees, that Bibbins' damages stemming from his wrongful incarceration should be mitigated by the fact that he served a concurrent sentence based on his 2004 conviction.

However, admission of the 2004 conviction is still dependent on a probative value versus prejudicial effect balancing test. *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978). On this issue, the court agrees with Bibbins. This is a case in which Bibbins claims he was wrongfully imprisoned for rape. Rape is the conviction the defendants seek to introduce. But not only that, the conviction relates to a rape that occurred around the same time that the Canty rape took place. This is unduly prejudicial evidence, as its true effect will be to inflame the juror's emotions. The court's worry is that Bibbins, while perhaps involved with criminal elements (as evidenced from his criminal record), will not get a fair trial in front of the jury. *See Gora v. Costa,* 971 F.2d 1325, 1331 (7th Cir.1992) ("[C]ivil rights actions which serve an essential deterrent function in hopes of protecting citizens' vital rights 'often pit unsympathetic plaintiffs-criminals, or members of the criminal class ... against the guardians of the community's safety....' [C]ourts should be careful to ensure that a civil rights plaintiff's criminal past is not used to unfairly prejudice him or her.").

Nonetheless, the court must equally protect the rights of the defendants, and they have a right to show that Bibbins' damages claims are inflated. Bibbins, in the spirit of compromise, has agreed to limit his damages request at trial to the 10 years that all parties agree were attributable to the conviction for the Canty rape. The court takes Bibbins' offer and makes it a court order. The parties are hereby ordered to stipulate to the 10 years that will serve as the basis for the claim for damages vis a vis the incarceration based on the Canty conviction. Taking this course of action will mitigate any damages, and also give Bibbins a fair trial. In the event that the parties cannot agree to the 10 years to which the damages will be limited, the jury will determine the amount of damages *with the 2004 conviction excluded.*[14]

---

**14.** "The district court has broad discretion to weigh the relevance, probative value, and

Finally, the court does not agree with the defendants that the 2004 conviction is admissible as evidence weighing on Bibbins' credibility, pursuant to Rule 609. Rule 609 carries with it a probative value versus prejudicial effect test. Rule 609(a). Thus even though Bibbins' conviction is less than 10 years old, it is too prejudicial and has little probative value. Rule 609(b). While the general presumption is that criminals are less credible than non-criminal witnesses, *Gora*, 971 F.2d at 1330, rape convictions are not generally probative of credibility. *See Christmas v. Sanders*, 759 F.2d 1284, 1292 (7th Cir.1985). Accordingly, the defendants' motion *in limine* is denied.

### Conclusion

It shall be the order of the court that:

First, the City's motion to dismiss on the basis of prescription (doc. 175) is hereby GRANTED IN PART AND DENIED IN PART. It is ordered that Bibbins' § 1983 false arrest claims against all defendants are dismissed with prejudice.

Secondly, the motion to strike the affidavit of Gary Wells (doc. 157) is hereby DENIED.

Thirdly, the motion *in limine* to exclude Gary Wells' testimony (doc. 166) is hereby GRANTED IN PART AND DENIED IN PART. Dr. Wells is precluded from offering an opinion on the issue of fabrication of evidence.

Fourth, Michelli's motion for summary judgment (doc. 116) is hereby GRANTED IN PART AND DENIED IN PART. It is ordered that the fabrication of evidence claims against Michelli are dismissed with prejudice.

Fifth, defendants Davis' and Remington's motion for summary judgment (doc. 119) is hereby DENIED IN FULL.

Sixth, the City's motion for summary judgment (doc. 127) is hereby GRANTED IN PART AND DENIED IN PART. Bibbins' only *Monell* claim left for trial is his claim of failure to train the officer defendants with respect to conducting identifications. All other *Monell* claims are hereby dismissed with prejudice. Bibbins' state law claims against the City are still alive.

Seventh, the defendants' motion *in limine* to admit the 2004 rape conviction (doc. 151) is hereby DENIED. Bibbins' 2004 rape conviction is hereby ordered inadmissible. The court hereby further orders the parties to stipulate to the ten-year period in which the issue of damages will be tried to the jury. In the event the parties cannot agree, the court will let the jury decide without hearing about the 2004 conviction.

Finally, it is ordered that all claims against defendants Laysone, Gayle, O'Brien, and Voinche are dismissed, as well as any claims alleging a conspiracy to violate Bibbins' constitutional rights. *See Bibbins' Memorandum in Opposition to Summary Judgment*, Doc. 142, pg. 3, n. 1.

It is SO ORDERED.

---

prejudice of the evidence in determining its admissibility under Rule 403." *United States v. Allard*, 464 F.3d 529, 534 (5th Cir.2006). The court has considered the defendants' arguments as to why the 2004 conviction is more probative than prejudicial. The conviction is much too prejudicial given the specific facts of this case.